United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 26, 2002 Decided May 3, 2002 

 No. 01-1052

 National Petrochemical & Refiners Association, 
 Petitioner

 v.

 Environmental Protection Agency, 
 Respondent

 International Truck and Engine Corporation, et al., 
 Intervenors

 Consolidated with 
 01-1092, 01-1093, 01-1094, 01-1130, 01-1132, 
 01-1134, 01-1404, 01-1414

 On Petitions for Review of Orders of the 
 Environmental Protection Agency

 Theodore L. Garrett argued the cause for petitioner Cum-
mins Inc. With him on the briefs was Andrew J. Heimert.

 Julie R. Domike argued the cause and filed the briefs for 
petitioner Volvo Truck Corporation.

 Michael F. McBride argued the cause for petitioner Na-
tional Petrochemical & Refiners Association, et al. With him 
on the brief were Maurice H. McBride, Bruce W. Neely, 
John W. Lawrence, John S. Hahn, Julie Anna Potts, Janice 
K. Raburn, David T. Deal, Thomas Sayre Llewellyn and Chet 
M. Thompson.

 William A. Anderson, II, argued the cause for petitioners 
Alliance of Automobile Manufacturers and Association of 
International Automobile Manufacturers, Inc. With him on 
the briefs were Julie C. Becker, Ellen L. Shapiro, Charles H. 
Lockwood and Susan A. MacIntyre.

 Jed R. Mandel and Timothy A. French were on the briefs 
for Engine Manufacturer petitioners.

 Eric G. Hostetler, Kent E. Hanson and Norman L. Rave, 
Jr., Attorneys, U.S. Department of Justice, argued the causes 
for respondents. With them on the briefs were Kenneth C. 
Amaditz, Attorney, U.S. Department of Justice, John T. 
Hannon, Michael J. Horowitz and Steven E. Silverman, 
Attorneys, U.S. Environmental Protection Agency.

 Howard I. Fox and John D. Walke were on the brief for 
intervenors American Lung Association, et al.

 Janice K. Raburn, David T. Deal, Thomas Sayre Llewel-
lyn, Michael F. McBride, Bruce W. Neely, John W. Lawrence 
and Maurice H. McBride were on the brief for intervenor 
American Petroleum Institute, et al.

 Hope M. Babcock, Richard Blumenthal, Attorney General, 
State of Connecticut, Kimberly Massicotte, Assistant Attor-
ney General, M. Jane Brady, Attorney General, State of 
Delaware, Kevin Maloney, Assistant Attorney General, J. 
Joseph Curran, Jr., Attorney General, State of Maryland, 
Kathy M. Kinsey, Assistant Attorney General, Thomas F. 
Reilly, Attorney General, Commonwealth of Massachusetts, 

Kirsten H. Engel, Assistant Attorney General, Philip T. 
McLaughlin, Attorney General, State of New Hampshire, 
Maureen D. Smith, Assistant Attorney General, Eliot Spit-
zer, Attorney General, State of New York, Peter H. Lehner, 
Assistant Attorney General, Robert A. Reiley, M. Dukes 
Pepper, Jr., Sheldon Whitehouse, Attorney General, State of 
Rhode Island, Tricia K. Jedele, Assistant Attorney General, 
Barbara Beth Baird and Jeri G. Voge were on the brief for 
intervenors State and Territorial Air Pollution Program Ad-
ministrators, et al. and amicus curiae South Coast Air Quality 
Management District. Jennifer L. Wazenski, Assistant At-
torney General, State of Maryland, entered an appearance.

 Laurence H. Levine, Robert M. Sussman, Julia A. Hatch-
er, William A. Anderson, II, Susan A. MacIntyre, Julie C. 
Becker and Ellen L. Shapiro were on the brief for intervenors 
International Truck and Engine Corporation, et al.

 Before: Sentelle and Tatel, Circuit Judges, and 
Williams, Senior Circuit Judge.

 Opinion for the Court filed PER CURIAM.

 PER CURIAM:1 We have here a set of challenges to an 
EPA rule affecting diesel fuel and engines. The rule requires 
drastic reductions in exhaust emissions starting in 2007 (for 
some emissions 95% lower than current standards). To aid in 
the achievement of the new emission standards, the rule also 
requires a 97% reduction in the sulfur level in diesel fuel. 
Numerous parties, including engine manufacturers (including 
Cummins Inc.), automobile makers, and fuel refiners, chal-
lenged the rule on various grounds, while others, including 
environmental groups and states, defended it. We deny the 
petitions.

I. The Regulations

 Diesel engines emit nitrous oxides ("NOx"), non-methane 
hydrocarbons, and particulate matter ("PM"), all of which are 

__________
 1 Parts I and II of the opinion are by Senior Judge Williams; 
part III is by Judge Sentelle; and parts IV and V are by Judge 
Tatel.

harmful to the environment and human health (as no party 
disputes). Fulfilling its duty under the Clean Air Act to set 
emission standards that "reflect the greatest degree of emis-
sion reduction achievable" through cost-effective technology, 
42 U.S.C. s 7521(a)(3), the EPA decided on dramatic reduc-
tions of diesel engine emission standards, issuing a final rule 
on January 18, 2001: Control of Air Pollution from New 
Motor Vehicles: Heavy-Duty Engine and Vehicle Standards 
and Highway Diesel Fuel Sulfur Control Requirements, 66 
Fed. Reg. 5002 (2001) (hereinafter "2007 Rule").

 The 2007 Rule sets the following standards for diesel 
engines: 0.01 grams per brake-horsepower-hour (g/bhp-hr) 
for PM, 0.20 g/bhp-hr for NOx, and 0.14 g/bhp-hr for non-
methane hydrocarbons. 66 Fed. Reg. at 5005; 40 C.F.R. 
s 86.007-11(a)(1), (3). For PM and NOx, the new standards 
are "90 percent and 95 percent below current standard levels, 
respectively." 66 Fed. Reg. at 5002. Engine emissions are 
to be measured by the Federal Test Procedure, see 40 C.F.R. 
s 86.1301-90 et seq., as well as two other test procedures that 
are not at issue in this case.

 The standard for PM takes full effect in 2007. 66 Fed. 
Reg. at 5005. The standards for NOx and non-methane 
hydrocarbons, however, will be phased in as follows: 50% of a 
manufacturer's sales for 2007, 2008 and 2009 engines and 
100% of sales for 2010 and following. Id.; 40 C.F.R. 
s 86.007-11(g). During the phase-in period, manufacturers 
will be allowed to participate in an averaging, banking, and 
trading ("ABT") program. This program allows the genera-
tion of credits from engines that beat the standards; the 
credits can then be applied to engines that may not be able to 
meet the 2007 standards right away. 66 Fed. Reg. at 5109-
11; 40 C.F.R. s 86.007-15. A crucial distinction is made 
here: Averaging across service classes (e.g., between light 
heavy-duty engines and heavy heavy-duty engines) is allowed, 
but not banking or trading. 66 Fed. Reg. at 5110.

 The 2007 Rule also eliminates a preexisting exception--
available only for turbocharged heavy-duty diesel engines--
for emissions from engine crankcases. 66 Fed. Reg. at 5040; 

40 C.F.R. s 86.007-11(c). As a result, any crankcase emis-
sions not eliminated count against a vehicle's emission limit.

 High pollutant levels in fuel make it impossible or at least 
far more difficult to achieve low emissions. Thus, under its 
authority to regulate any fuel components that significantly 
impair "the performance of any emission control device or 
system," 42 U.S.C. s 7545(c)(1)(B), the EPA also decided to 
require "a 97 percent reduction in the sulfur content of diesel 
fuel." 66 Fed. Reg. at 5002. As of 2006, the maximum sulfur 
content of diesel fuel will be reduced from 500 ppm to 15 
ppm. (Under a 15 ppm cap, the EPA predicts that the 
average sulfur level in diesel will actually be 7 ppm. Re-
sponse to Comments at 3-50.) Under its "Temporary Com-
pliance Option," the EPA actually requires that only 80% of 
fuel from any given refinery meet the 15 ppm cap in years 
2006-08. Any overachieving refiner will generate credits, 
which it can then use to average with another refinery owned 
by that refiner, bank for future years, or sell to another 
refiner. 66 Fed. Reg. at 5065.

II. The Emissions Standards

 We review the 2007 Rule under the arbitrary and capri-
cious standard of 42 U.S.C. s 7607(d), which is indistinguish-
able from the Administrative Procedure Act equivalent. See 
Ethyl Corp. v. EPA, 51 F.3d 1053, 1064 (D.C. Cir. 1995); 
Small Refiner Lead Phase-Down Task Force v. EPA, 705 
F.2d 506, 519 (D.C. Cir. 1983). Deference is particularly 
great where EPA's decision is based on complex scientific or 
technical analysis. Appalachian Power Co. v. EPA, 251 F.3d 
1026, 1035 (D.C. Cir. 2001).

A. Background on Emissions Control Technology

 Diesel exhaust emissions can be controlled through the use 
of catalytic emission control devices in the vehicle's exhaust 
system. 66 Fed. Reg. at 5007. These resemble the familiar 
catalytic converters found on ordinary automobiles. Id. 
Current control devices for diesel engines work less well than 
they do for gasoline engines, because of diesels' "oxygen-rich 
and relatively cool ... exhaust environment." Id. at 5009. 

PM emissions are also more difficult to control in diesel 
engines because of the soot formed during diesel combustion. 
Id. Compounding the difficulties is the fact that "historical 
diesel NOx control approaches tend to increase PM and vice 
versa, but both are harmful pollutants that need to be con-
trolled." Id.

 Thus, in order to achieve drastic--and simultaneous--re-
ductions in PM, NOx, and non-methane hydrocarbons, engine 
manufacturers will need technical innovations in emission 
controls. The EPA predicts that two relatively new technolo-
gies will aid in achieving the 2007 reductions: the catalyzed 
diesel particulate filter ("particulate filter") and the NOx 
adsorber. 66 Fed. Reg. at 5036. In the following para-
graphs, we explain briefly--and to the best of our under-
standing--how each technology works on the targeted emis-
sions.

 Particulate matter is made up of three things: Unburned 
carbon particles (or soot), unburned hydrocarbons (also called 
the "soluble organic fraction"), and sulfates (resulting from 
the oxidation of sulfur in the engine's exhaust). 66 Fed. Reg. 
at 5047. The majority of diesel PM is soot. Catalyzed 
particulate filters work by passing the exhaust through a 
ceramic or metallic filter that captures soot and other PM.

 Particulate filters eventually become plugged up with par-
ticulate matter, at which point the collected particles (mostly 
carbon) have to be burned off (or oxidized). Id. The 
burning-off process is called "regeneration," and the result 
(from oxidizing carbon) is of course carbon dioxide. Id. The 
EPA was convinced that precious metal catalysts would make 
regeneration possible at the low temperatures typical of 
diesel engines, and that such catalysts could thus be used on a 
continuous basis throughout the life of the trap. Id.; see also 
Regulatory Impact Analysis ("RIA") III-6.

 NOx adsorbers do their work by storing NOx during the 
normal oxygen-rich conditions of diesel engine operation. 
RIA III-18. Over time, the adsorber becomes full of the 
stored NOx, thus requiring regeneration. During regenera-
tion, the excess NOx is burned off; technically, it is reduced 

to N2 by an interaction with carbon monoxide across a 
catalyst system that typically contains platinum and rhodium; 
the less-harmful gases that result are N2 and CO2. Id. Like 
NOx, sulfur from the fuel accumulates over time by bonding 
to the NOx adsorber's catalysts, and must be burned off 
during a "desulfation" process (more on that below). The 
EPA suggests the use of dual-bed NOx adsorbers (for a 
diagram, see RIA III-23), which involve splitting of the 
exhaust stream into two pipes, each of which has an adsorber 
bed. The benefit of such an arrangement is that regenera-
tion and/or desulfation can be conducted in one bed while 
nearly all the exhaust stream is directed to the bed that is 
still in adsorbtion mode, thus maintaining a consistent level of 
performance. RIA III-22 to III-25.

 Crankcase emissions are emitted from the vehicle's crank-
case, having gotten there by leaking from the combustion 
chamber through the piston rings. 66 Fed. Reg. at 5040. 
The EPA's elimination of the previous exception for such 
emissions is a "performance requirement," leaving the solu-
tion entirely up to manufacturers. Id. The EPA predicts 
that manufacturers will either filter crankcase gases and 
route them back into the engine intake, or route the gases 
into the exhaust stream (upstream of any emissions control 
devices). RIA III-78-79. Another option would be to vent 
crankcase gases directly to the atmosphere; this is an unlike-
ly choice, because the combined emissions from exhaust and 
crankcase together would have to fall within the exhaust 
emissions standards. 66 Fed. Reg. at 5040.

B. Cummins's Challenges

 1. Feasibility of NOx and PM Standards
 
 Cummins argues that the EPA acted arbitrarily and capri-
ciously in concluding that engine manufacturers will be able 
to develop emissions-control systems satisfying the new rule. 
According to Cummins, the EPA failed to make "reasonable 
extrapolations," Cummins's Opening Brief at 5 (quoting Nat-
ural Resources Defense Council v. Thomas, 805 F.2d 410, 432 
(D.C. Cir. 1986)), or to "provide a reasoned explanation for 
believing that its projection is reliable," id. (quoting National 

Resources Defense Council, Inc. v. EPA, 655 F.2d 318, 328 
(D.C. Cir. 1981)).

 In reviewing these issues, we note that EPA was "not 
obliged to provide detailed solutions to every engineering 
problem," but had only to "identify the major steps" for 
improvement and "give plausible reasons for its belief that 
the industry will be able to solve those problems in the time 
remaining." Husqvarna AB v. EPA, 254 F.3d 195, 201 (D.C. 
Cir. 2001) (quoting NRDC, 655 F.2d at 333). Since the EPA 
is authorized to adopt "technology-forcing" regulations, see 
NRDC, 655 F.2d at 333; Sierra Club v. Costle, 657 F.2d 298, 
364 (D.C. Cir. 1981), a petitioner's evidence that current 
technology is inadequate is not enough to show that the EPA 
was arbitrary in predicting future success.

 a. Availability of Adequate NOx Adsorbers
 
 In support of its assessment that manufacturers can feasi-
bly meet the 2007 standards using NOx adsorbers, the EPA 
pointed to the successful results achieved already in various 
test programs. For example, the National Vehicle and Fuel 
Emission Laboratory ("NVFEL") program reached the fol-
lowing conclusion: "This test program has shown that NOx 
adsorbers and [particulate filters] are capable of greater than 
90% emission reductions ... after running approximately 200 
hours on 5 ppm sulfur equivalent fuel, without a desulfation 
event. With reasonably expected desulfation, the expected 
NOx reduction efficiency would be higher." EPA, 2007 Diesel 
Emission Test Program, Initial Test Report at 31, IV-A-29 
(Dec. 11, 2000) (hereinafter "NVFEL Study"); see also RIA 
III-35 to III-48 (discussing the NVFEL test program). The 
Department of Energy's Diesel Emission Control Sulfur Ef-
fects ("DECSE") program produced several reports finding 
"NOx conversion efficiencies exceeding 90 percent...." RIA 
III-35. And ironically, Cummins's own researchers (cited by 
the EPA's Regulatory Impact Analysis) reported using a NOx 
adsorber that cut NOx emissions by 98% on the Federal Test 
Procedure, to a level of 0.055 g/bhp-hr (slightly more than a 
quarter of the 0.20 g/bhp-hr standard adopted for 2007). 

Byron Bunker, Memo to File II-E-25, Handout 6 (Sept. 18, 
2000) (Joint Appendix "J.A." III 1947); see also RIA III-34.

 Other industry commenters agreed that NOx adsorber 
technology could be developed and available by 2007. See, 
e.g., Letter of Manufacturers of Emission Controls Associa-
tion (April 5, 2000), II-G-60; Testimony of Johnson Matthey 
(June 22, 2000), IV-F-100; Testimony of the Engelhard 
Corp. (June 27, 2000), IV-F-188; Letter of Apyron Technolo-
gies, Inc. (Aug. 10, 2000), IV-D-227; Letter of the Engelhard 
Corp. (Oct. 3, 2000), IV-G-38; Letter of Johnson Matthey 
(Oct. 19, 2000), IV-G-55. Of course it is no surprise that NOx 
adsorber manufacturers would support a regulation creating 
a potential for sales of their products. See, e.g., George J. 
Stigler, The Economic Theory of Regulation, 2 Bell J. Econ. 
& Management Sci. 3 (1971). But such a manufacturer would 
risk a considerable loss of reputation if its technology could 
not fulfill a mandate that it had persuaded EPA to adopt. So 
the submissions add something to the more direct experimen-
tal evidence.

 Cummins, however, asserts that no NOx control system will 
be capable of meeting the EPA's 2007 standards. It presents 
three reasons to support this conclusion; ultimately, we are 
convinced by none.

 * * *

 First, Cummins argues that though the EPA standards in 
effect require NOx adsorbers to operate at 90% efficiency, 
rapid degeneration will prevent them from lasting for any-
where near the useful life of a heavy heavy-duty diesel 
engine. According to Cummins, the EPA's tests showing the 
requisite 90% efficiency were short-term rather than for 
extended periods.

 Cummins fails, however, to give a full picture of the EPA's 
research. Whereas Cummins claims that a certain EPA test 
was only short-term, it actually involved a NOx adsorber 
system that had already accumulated "190 hours of opera-
tion," the equivalent of "more than 13,000 miles of driving." 
RIA III-48. Moreover, the test did not include any desulfa-

tion events (see below), which likely reduced performance; 
even so, the NOx adsorber was almost able to meet the 2007 
standard. Id. (Table III.A-4). Cummins also cites a test 
mentioned at 66 Fed. Reg. 5049 as showing that degradation 
happens after 600 miles. But that test used 150 ppm diesel 
fuel--10 times the maximum level allowed by the 2007 Rule 
(and 20 times what EPA believes the 15 ppm cap will yield in 
practice). Cummins also complains that the DECSE study 
cited by the EPA showed that 90% efficiency declined to 75% 
after only 40 hours--and that was using 3 ppm sulfur fuel to 
boot. Cummins's Opening Brief at 8 (citing RIA III-66 & 
Fig. III.A-15). Overall, NOx adsorber performance degraded 
by 2% per hour of operation, with higher degradation when 
higher sulfur fuel was used. Id. (citing RIA III-67). But the 
EPA never denied that degradation is currently something of 
a challenge; what matters is whether (as discussed below in 
regard to desulfation) the EPA was arbitrary or capricious in 
predicting that degradation could eventually be controlled.

 * * *

 In a closely-related argument, Cummins urges that the 
desulfation process is an intractable obstacle to long-lasting 
NOx adsorbers. As we've said, the NOx adsorber works 
primarily by adsorbing NOx on catalysts. 66 Fed. Reg. at 
5059. Sulfur, however, bonds to the catalysts as well, clog-
ging up the catalyst sites and degrading performance. Id. 
To prevent degradation, NOx adsorbers must periodically be 
subject to "desulfation," a process that removes sulfur. De-
sulfation, however, requires that exhaust temperatures be 
increased--and this in turn poses a risk of so-called "sinter-
ing," in which the catalysts are melted. Id. at 5060. Sinter-
ing, unsurprisingly, degrades the device's future NOx adsor-
bance. Id.

 The result, according to Cummins, is a technical "catch-22" 
that pulls manufacturers in "conflicting directions." On one 
hand, desulfation should happen often and at high tempera-
tures to prevent clogging by sulfur; on the other hand, 
frequent, high-temperature desulfation itself degrades NOx 

adsorbance. As Cummins sees it, the EPA presents no 
reason to think that this technical obstacle will be overcome, 
other than "unsupported predictions of government and 
private-sector observers, who assert in conclusory fashion 
that technology that overcomes these inherent problems will 
develop in due time." Cummins's argument turns on its 
heavy discounting of the studies relied on by EPA.

 Cummins says that the Ford Study (Mark A. Dearth et al., 
Sulfur Interaction with Lean NOx Traps (Oct. 1998) J.A. III 
2187)) is not strictly relevant because it was performed using 
a "pulsator," a device that burns synthetic gases and injects 
pollutants to test catalyst performance. Cummins seems to 
regard it as self-evident that the use of a pulsator leads to 
inaccurate or inapplicable results. In making this assumption 
it overestimates our technical sophistication. The EPA ar-
gues in response that the pulsator experiment does shed light 
on the ability of NOx adsorbers to withstand desulfation. As 
Cummins gives no articulable reason to doubt this conclusion, 
we cannot fault the EPA for having relied on the study.

 As for Cummins's objection that further Ford experiments 
found significant degradation, the EPA observes that these 
further experiments were conducted at temperatures of 900 
to 1000 degrees Celsius (see Ford Study, J.A. III 2192-93), 
whereas a "heavy-duty diesel engine in contrast rarely has 
exhaust gas temperatures in excess of 500